IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

DAVID L. CHERRY                                                          PLAINTIFF

v.                                                   CIVIL ACTION NO. 1:21-CV-59-SA-DAS

PREMIER PRINTS, INC.                                                    DEFENDANT

ORDER AND MEMORANDUM OPINION

On March 24, 2021, David L. Cherry initiated this civil action by filing his Complaint [1] against Premier Prints, Inc. Now before the Court is Premier Prints' Motion for Summary Judgment [38]. Having reviewed the parties' filings, as well as the applicable authorities, the Court is prepared to rule.

*Relevant Factual Background*

David L. Cherry is a homosexual male who was previously employed by Premier Prints, a fabric manufacturing company located in Sherman, Mississippi. Premier Prints, a relatively small company of approximately 30 employees, was jointly started around 1991 by three brothers—Norman "Zeke" Hodges, Johnny Hodges, and Billy Hodges—each of whom owned one-third of the company.[1] Primarily, the company manufactures fabric and sells it across the United States.

Cherry began his employment with Premier Prints in November 1996. Zeke Hodges, who serves as president of the company, made the decision to hire Cherry. Throughout his employment, Cherry held numerous positions with the company. In approximately 2004 or 2005, he transitioned from the production side of the company to the sales side and became both the General Manager and the Sales Manager. Although taking on more of a sales role at this time, he was still very

---

[1] After Johnny Hodges' death around 2017, his wife, Sherry Hodges, assumed his one-third ownership interest in the company.

involved with production. At all times pertinent to this lawsuit, Cherry was the company's highest ranking non-equity employee.

From the time Cherry's employment commenced until around 2013, Premier Prints' sales volume and profits consistently improved each year.  In 2013 (the high-water mark), the company had a sales volume of $23,204,219 and a profit of $5,950,018; however, it experienced a dramatic decrease over the next several years. By comparison, four years later in 2017, the company's sales volume had dropped to $13,610,093 and profits had decreased to $1,649,010.

This is where the parties' respective versions of events diverge. On the one hand, Cherry testified that the decrease in sales and profits could be linked to increased foreign competition in the market. He stated that the entire industry experienced similar diminished sales and profits. On the other hand, Premier Prints contends that the decrease was due to a strategy Cherry had implemented. The company frames that issue as follows:

> Premier's sales and profits had been dropping at an alarming rate since 2013. The initial fundamental issue between Premier's owners and Cherry was the disagreement between Billy and Cherry on the direction of the company. Billy felt that Premier should continue to make more basic, lower cost products, that he felt was responsible for Premier's earlier success. Cherry wanted to, in Billy's words, "reinvent[] Premier Prints" by running more complex and costly designs. These concerns were echoed by Zeke, but it seems that the principal actors in this ongoing dispute were Billy and Cherry. This issue continued for some time until Billy finally acquiesced. However, in acquiescing, Billy told Cherry that he would "give you enough rope to hang yourself, but please don't. And he did it anyway. He didn't stop. He kept doing it."

[39] at p. 5 (internal citations omitted).

In March of 2018, the owners removed certain operations responsibilities from Cherry and directed him to concentrate more exclusively on sales. His compensation was restructured from being based on production to a sales commission structure. As with the reason for the company's

decreased sales, the reason for the change in Cherry's job responsibilities and his pay structure is disputed. Premier Prints contends that the change was the product of Cherry's ongoing lack of commitment, communication, and engagement. In fact, Zeke testified that he told Cherry around this time that he was "headed down the wrong direction." [38], Ex. 2 at p. 7. Conversely, Cherry avers that he had various conversations with the owners and that they ultimately reached the conclusion to shift him to sales "so he could find out what the problems were [with the company's sales] and talk to the customers." [45] at p. 7.

In September 2019, Cherry married his husband, Cameron Horn. Cherry contends that, prior to September 2019, nobody at Premier Prints knew that he was homosexual and that, once word of his marriage spread across the company, everyone "seemed shocked." [44], Ex. 1 at p. 18. He avers that he was scared to reveal his sexual orientation to anyone at Premier Prints because he knew that Zeke had a negative opinion of homosexuals. Cherry addressed that issue in detail in one of his written discovery responses, stating as follows:

> I knew [Zeke] had a negative opinion of gay men because he told me multiple times about his former boss that was gay and that it disgusted him. He also frequently made derogatory remarks behind the backs of men that either were gay or that he perceived as gay. Examples are Greg Morgan and Bill Butchkavitz. His favorite remarks were, "Should I turn queer or get a sex change?" And he would take fabric samples and hold them in front of his genitals and say, "Do you like the samples now?" He did this in front of Clint Wright and Michael Hodges as well as me. The customers never knew he was making those statements. He also slapped me on my buttocks as a congratulations. All of which made me very uncomfortable and afraid for him to find out that I am a homosexual. He also made very primitive and degrading remarks about Cliff Walters when he was an employee. I knew he would have a negative response if he ever found out that I am a gay man.

[44], Ex. 5 at p. 4.

Cherry expounded on these allegations in his deposition, testifying that Zeke made these comments "periodically through the years" at various trade shows, including Las Vegas, Los Angeles, and High Point. [44], Ex. 1 at p. 18. Further, when asked about whether he thought Zeke was acting maliciously when making those comments, Cherry stated: "I don't know that I tried to assess his intent. I was just trying to not react bad so that he would either attack me or fire me[.]" *Id*. at p. 19. As to Cherry's allegations, Zeke admitted that he "put fabric samples in front of [his] genitals and said 'do you like the samples now'" on one occasion, but he said that it was "just a joke to Michael [Hodges]." [38], Ex. 2 at p. 8.

According to Cherry, after everyone at the company learned of his marriage to Cameron, his fears about Zeke and others learning about his sexual orientation ultimately became a reality. He testified that his relationship with Zeke changed drastically after Zeke learned of his marriage— in particular, he testified that, despite previously having enjoyed a good relationship with Zeke, they rarely communicated from that point forward.

Premier Prints points to two events which occurred in late 2019 that it considered critical. The first event involved a company called "Chapter Three," which was one of Premier Prints' biggest accounts. Zeke, Cherry, and Chapter Three's owner had a lunch meeting, during which Zeke expressed his sincere appreciation for Chapter Three's continued business. However, unbeknownst to Zeke, Chapter Three's account was significantly past due. Premier Prints contends that Cherry was aware of Chapter Three's overdue account status but intentionally did not advise Zeke of the same. Cherry testified to the contrary, specifically testifying he was unaware of the issue at the time of the lunch meeting.

Also, in November 2019, Cherry took Cameron with him to the trade show in High Point, North Carolina. During the trade show, Cameron met with Premier Prints' customers and, at least

arguably, appeared to act on behalf of the company. Cherry admittedly did not seek permission from the owners to take Cameron to the show. By all accounts, Billy and Zeke were both outraged when they learned that Cameron had attended the trade show. Although they admit that taking a spouse to a trade show does not violate any written company policy, Billy testified that it was "general knowledge" that doing so was unacceptable. [38], Ex. 1 at p. 5.

On April 13, 2020, Billy and Zeke advised Cherry that he was being laid off. During that meeting, Zeke specifically told Cherry "I don't know you anymore." [44], Ex. 1 at p. 21. Billy testified that he was the one who made the ultimate decision to lay off Cherry. Although he was laid off, as opposed to being terminated, Cherry was never rehired at Premier Prints.

Cherry filed his Complaint [1] on March 24, 2021, alleging that Premier Prints discriminated against him because of his sexual orientation. Through the present Motion [38], Premier Prints seeks dismissal of that claim.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323). "The

nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

"Title VII prohibits employment discrimination against 'any individual . . . because of such individual's . . . sex.'" *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 332 (5th Cir. 2019) (quoting 42 U.S.C. § 2000e-2(a)(1)). Until only recently, courts interpreted Title VII in such a manner as to *not* prohibit discrimination based on sexual orientation. *See*, *e.g.*, *Wittmer*, 915 F.3d at 335 n. 2 (Ho, J., concurring) (collecting cases); *Dillon v. Frank*, 952 F.2d 403, at *4 (6th Cir. 1992) ("The circuits are unanimous in holding that Title VII does not proscribe discrimination based on sexual activities or orientation."). However, in 2020, the Supreme Court decided the landmark case of *Bostock v. Clayton County*, wherein it held that sexual orientation is protected under the "sex" category of Title VII. *Bostock v. Clayton Cnty., Ga.*, --- U.S. ---, 104 S. Ct. 1731, 1754, 207 L. Ed. 2d 218 (2020) ("In Title VII, Congress adopted broad language making it illegal for an employer to rely on an employee's sex when deciding to fire that employee. We do not hesitate to recognize today a necessary consequence of that legislative choice: An employer who fires an individual merely for being gay or transgender defies the law."). Consequently, discrimination on the basis

6

of sexual orientation is now actionable under Title VII, and Cherry may pursue his claim against Premier Prints.

Prior to addressing the viability of his Title VII discrimination claim, the Court notes one additional matter. In his Response Memorandum [45], Cherry seems to allege a retaliation claim, despite having not previously pled such a claim in his Complaint [1]. Specifically, he avers:

> As discussed above, Billy Hodges testified that Cherry was laid off and eligible for rehire at that time. However, he is no longer eligible for rehire because he filed a charge with the EEOC. That is direct evidence of retaliation.
>
> While Plaintiff did not file a second EEOC charge, there was no need to do so because the retaliation flowed out of Plaintiff's original EEOC charge of sexual orientation discrimination. Further, this evidence was not discovered until October 15, 2021, over a year [and] a half after Cherry was laid off. Plaintiff similarly also did not amend his Complaint because the amendment deadline had passed.

[45] at p. 27-28.

The Court has trouble accepting this argument. In particular, the Court notes that the conversation between Billy and Cherry occurred shortly after Cherry was laid off. Although their versions of fact differ as to how that conversation unfolded, it is apparent that the conversation was not a pleasant one and that it became heated. Cherry contends that, at that time, he did not know why Zeke would not talk to him but only learned during Zeke's deposition on October 15, 2021, that the underlying reason was because Cherry had filed an EEOC charge against Premier Prints. As noted above, Cherry contends that the same constitutes direct evidence of retaliation actionable under Title VII.

Even taking that version of events as true, Cherry still did not seek to amend his Complaint [1]. As noted above, he stated in his Response Memorandum [45] that he did not do so "because the amendment deadline had passed." [45] at p. 28.

Despite Cherry stating that he did not seek to amend because the deadline to do so had already passed, parties routinely seek post-deadline amendments. *See*, *e.g.*, *Alston v. Prairie Farms Dairy, Inc.*, 2018 WL 9866506, at *1 (N.D. Miss. Jan. 17, 2018) (setting forth the standard for a post-deadline amendment). As this Court explained in *Alston*, when a party seeks to amend after the applicable deadline, Rule 15(a)(2) governs, which provides:

> *(2) Other Amendments.* In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

FED. R. CIV. P. 15(a)(2).

While an amendment is "by no means automatic," a district court retains discretion in deciding whether to permit an amendment. *See Alston*, 2018 WL 9866506 at *1 (citing *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981); *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004)). And "a party seeking to amend its pleadings after a deadline has passed must demonstrate good cause for needing an extension." *Id.* (quoting *Hull v. City of New Orleans*, 2016 WL 879993, at *1 (E.D. La. Mar. 8, 2016)) (additional citations omitted).

As these authorities clearly illustrate, there is a well-established test to be applied when a party seeks to amend a pleading after the deadline to do so has passed. Here, though, Cherry never sought to amend his Complaint [1], but instead raises the issue now in response to Premier Prints' Motion for Summary Judgment [38]. This is not the appropriate way to seek a post-deadline amendment, and the Court therefore will not consider a retaliation claim which has not been pled nor sought to be added to the Complaint [1].

The Court will instead consider the claim which Cherry has properly pled—that he was unlawfully discriminated against on the basis of his sexual orientation. In analyzing such a claim, the Court applies the familiar *McDonnell Douglas* framework. *See*, *e.g.*, *Sarco v. 5 Star Financial,*

*LLC*, 2022 WL 883936, at *9 (W.D. Virg. Mar. 24, 2022) (applying the *McDonnell Douglas* framework to a sexual orientation claim in a post-*Bostock* case); *see also Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007) ("Where . . . there is no evidence of direct discrimination, Title VII discrimination claims based on circumstantial evidence are analyzed under the framework established in *McDonnell Douglas*.").

Under that framework, the plaintiff bears the initial burden to establish a *prima facie* case by showing:

> (1) that [he] is a member of a protected class; (2) that [he] was qualified for the position sought; (3) [he] was subject to an adverse employment action; and (4) [he] was replaced by someone outside [his] protected class or was treated less favorably than other similarly situated employees outside [his] class.

*Haire v. Bd. of Supervisors of La. State Univ. Agric. and Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013); *see also Wittmer*, 915 F.3d at 332.

If the plaintiff carries his *prima facie* burden, "the burden shifts to the employer to show it had a legitimate, nondiscriminatory reason for [the employment action]." *Wittmer*, 915 F.3d at 332 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). "If the employer can show a legitimate, non-discriminatory reason for not hiring the plaintiff, the presumption of discrimination disappears, and the burden shifts back to the plaintiff to show either that the proffered reason was a pretext for discrimination, or that the plaintiff's protected status was another motivating factor for the decision." *Id*. (citing *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007)).

A.      *Prima Facie Case*

The Court first turns to Cherry's *prima facie* burden. The first three elements are easily satisfied for summary judgment purposes, as Cherry is a member of a protected class

9

(homosexual); was qualified for his position; and was subjected to an adverse employment action (being laid off from his employment).

Premier Prints understandably does not request dismissal as to those three elements, instead focusing its argument on the fourth element. In particular, Premier Prints takes the position that "not only is there no evidence that others similarly situated were treated more favorably; the evidence is that a heterosexual female was treated similarly." [39] at p. 12. Premier Prints then explains that Kim McKissick, another long time Premier Prints employee, was terminated in May 2020 after her job performance began to deteriorate. In an affidavit, Billy explained that McKissick was counseled on multiple occasions and her job duties were restructured in an attempt to assist her; however, when her performance did not improve, she was ultimately terminated.

In response, Cherry contends that he was replaced by Chris Curtis, a heterosexual male. Premier Prints contends that Curtis did not replace Cherry. In particular, the company emphasizes that Curtis "was hired some two and a half years later" as the plant manager. [49] at p. 3. For the sake of clarity, because Curtis testified that he was hired in May 2020, the Court assumes that Premier Prints' contention on this point is that Curtis was hired about two and a half years after Cherry's job responsibilities were shifted to focus on sales, as opposed to after Cherry being laid off.

This is not a straightforward issue—mainly because although Cherry's job duties were shifted in 2018, he still performed some duties which would typically be performed by a plant manager. In his deposition, Zeke testified:

> **Q.** When he was – after he was terminated, who took over his roles?
>
> **A.** Who took over David?

10

> **Q.** The jobs that he was doing. Who had to take over the roles that he was performing prior to him being terminated?
>
> **A.** Well, the selling part, nobody did. I mean, I've always sold. But Chris took the plant manager part.
>
> **Q.** Chris?
>
> **A.** Chris Curtis.

[44], Ex. 2 at p. 4.

Zeke's testimony on this issue recognizes, at least implicitly, that Curtis, a heterosexual male, took over part of Cherry's job responsibilities. However, this point raises an interesting issue. Specifically, Premier Prints contends that it would be "illogical" to require an employer "to find a homosexual male, and only a homosexual male, to replace the employee." [49] at p. 2 n. 1. This Court recognizes Premier Prints' argument on this point. However, with *Bostock* having only been decided recently, this body of law has not been fully developed. The parties have cited no authorities directly on point on this issue, and the Court has likewise been unable to locate any such authority.

Nevertheless, what is clear is that "the *prima facie* case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Johnson v. La.*, 351 F.3d 616, 622 (5th Cir. 2003) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)) (internal quotation marks omitted); *see also Walsdorf v. Bd. of Comm'rs for the East Jefferson Levee Dist.*, 857 F.2d 1047, 1051 (5th Cir. 1988) (noting that the Supreme Court has "warned against a rigid, mechanized, or ritualistic adherence to the *prima facie* case method established in McDonnell Douglas.") (citations and quotation marks omitted).

Recognizing that the *prima facie* burden was intended to be flexible and considering the evidence before it, the Court finds that the case should not be dismissed on that ground. Rather, the Court finds that Cherry should be permitted to proceed.[2]

### B.    Legitimate, Nondiscriminatory Reason

Premier Prints contends that it took the subject employment action purely based upon work performance issues. At this stage, Premier Prints' burden is only a burden of production, as opposed to a burden of persuasion. *See, e.g.*, *Gonzales v. ConocoPhillips Co.*, 806 F. App'x 289, 292 (5th Cir. 2020) (citing *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)) ("Once [the plaintiff] demonstrates a prima facie case, the burden of production shifts to [the employer] to offer an alternative, nondiscriminatory explanation for the adverse employment action.").

Cherry does not dispute that Premier Prints has carried this burden for purposes of this stage of the proceedings. The Court agrees. Premier Prints has carried its burden of production.

### C.    Pretext

At this point, the "presumption of discrimination created by the *prima facie* case disappears, and the plaintiff is left with the ultimate burden of proving discrimination." *Sandstad v. CB Richards Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511-12, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)). A plaintiff may carry his burden at this stage "through use of various forms of circumstantial evidence, including evidence of

---

[2] As noted above, Premier Prints also contends that it treated a heterosexual employee in a similar fashion to how Cherry was treated. In particular, Billy testified via affidavit that Kim McKissick, a longstanding employee who was heterosexual and "was a good employee until the last two to three years of her employment," was terminated in May 2020 after Billy "brought [his] concerns to her on multiple occasions, but her performance simply did not improve[.]" [38], Ex. 16 at p. 1. The Court notes, though, that while Premier Prints contends that it treated Cherry in the same fashion as McKissick—in particular, by advising him of his deteriorating performance—Cherry disputes that any employee or owner of Premier Prints ever advised him of his allegedly poor work performance, thereby distinguishing (at least for purposes of this stage of the proceedings) the circumstances surrounding Cherry's layoff and McKissick's termination.

disparate treatment or evidence tending to show that [the employer's] 'explanation is unworthy of credence.'" *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)) (additional citation omitted). However, "employment laws do not transform federal courts into human resources managers, so the inquiry is not whether [the employer] made a wise or even correct decision to terminate [the plaintiff]." *Id.* (citing *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005)). But "the ultimate determination, in every case, is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination." *Id.* (quoting *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000)).

Against that backdrop, the Court turns to Cherry's pretext arguments. At this juncture, the Court notes one factor which differentiates this case from other gender discrimination cases under Title VII—the employer's knowledge of the plaintiff's membership in a protected class. For example, in the Title VII cases which customarily come before this Court, it is not a disputed issue whether the employer knew of the plaintiff's gender or race. However, here, there is a significant dispute between the parties as to whether Premier Prints (in particular, its owners) knew Cherry was homosexual. There is no dispute that everyone at the company was aware of Cherry's sexual orientation after he got married in September 2019. However, Premier Prints takes the position that its owners "had long known of Cherry's likely sexual orientation" prior to his marriage. [39] at p. 1. To support this contention, Premier Prints points to Billy's deposition testimony, wherein he explained that Cliff Waters, a homosexual employee, told him around 2015 that he had seen Cherry at a gay bar the previous night.

Cherry frames the matter differently. He testified that, prior to his marriage, he never told anybody at Premier Prints that he was homosexual. From his perspective, nobody at Premier Prints would have had any reason to think he was homosexual. He specifically testified that "everyone" seemed surprised to learn of his homosexuality in September 2019. [44], Ex. 1 at p. 18. When questioned about who at the company seemed surprised to learn of his sexual orientation, Cherry stated: "Everyone. Beverly Williams, Tammy Rutherford, T.J., Zeke, of course, was very shocked." *Id*. The Court notes that Beverly Williams and T.J. McMillan, both of whom had worked with the company for several years, testified consistent with Cherry's representation on this point, noting that they became aware of Cherry's sexual orientation *after* he was married (though McMillan did testify that he had heard rumors of Cherry's homosexuality prior to that time). *See* [38], Ex. 7 at p. 2; [38], Ex. 8 at p. 3. Further, Meg Curtis, who began working with Premier Prints around 2003, testified that she found out about Cherry's homosexuality through gossip within the company after Cherry came into work wearing a wedding ring. *See* [38], Ex. 4 at p. 3.

Although Premier Prints points to circumstantial evidence concerning knowledge of Cherry's sexual orientation dating back some period of time, Cherry has also pointed to evidence indicating that his homosexuality only became common knowledge after his marriage in September 2019.[3] Therefore, for purposes of the present Motion [38] and viewing the facts in the

---

[3] Premier Prints also points to an incident in 2009 when Cherry's ex-wife came to the workplace and stated publicly that she had caught Cherry sleeping with a man. However, Premier Prints does admit that this could be passed off as "the act of an angry wife in the midst of a divorce[.]" [39] at p. 9. The company also asserts that on two other occasions Cherry had made sexual advances to two male employees of Premier Prints—Clint Wright and Michael Hodges (Zeke and Billy's nephew). In his deposition, Cherry explained that, as to the situation with Michael, it was actually Michael who made an advance toward him. As to Wright, Cherry admits that he made an advance toward him, but he still testified that the owners—in particular, Zeke—were surprised when word spread about Cherry's homosexuality in late 2019. Taking all of this into account, in the Court's view, it is unclear what knowledge Zeke and Billy had regarding Cherry's homosexuality prior to September 2019.

light most favorable to Cherry, the Court will assume that his sexual orientation only became known after his marriage.

As noted above, Premier Prints contends that Cherry was laid off because of poor work performance. Furthermore, Premier Prints asserts that multiple individuals had conversations with Cherry about his performance and the need to improve. For example, Meg Curtis testified that Cherry "seemed disengaged and more disinterested" over the last couple years of his employment and that she discussed his work performance with him in September 2019. [38], Ex. 4 at p. 2.

Cherry categorically denies that his work performance was poor, in addition to also denying that anybody communicated with him about any work performance issues. Despite Premier Prints' representation that there were performance issues dating back multiple years, there is no documentation indicating that poor performance. On this point, Zeke testified as follows:

> **Q.** So it is your contention that his work performance went downhill the last few years?
>
> **A.** Well, it had been going down more than two years.
>
> **Q.** How long had it been going down?
>
> **A.** Probably seven.
>
> **Q.** Seven years?
>
> **A.** Uh-huh (Indicating yes).
>
> **Q.** And other than you testifying about that or whoever is going to testify today might say that, I haven't seen one piece of documentation, no e-mail, no text message, not one – any documentation any time that ever criticized his work performance. Can you identify any documentation that ever criticized his work performance? E-mail, text message, anything?
>
> **A.** I didn't write any of it down, no.

> Q.    So my question is, are you aware of any documentation that Premier Prints has that in any way criticizes his work performance up until the day he was terminated?
>
> A.    I don't think we ever did document anything.
>
> Q.    Not even a text message –
>
> A.    Nothing.

[44], Ex. 2 at p. 7.[4]

In analyzing Cherry's denial of his allegedly poor work performance, the Court is aware that "[m]ere disputes over an employer's assessment of an employee's performance do not create issues of fact." *Owens*, 33 F.4th at 831 (citing *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020)). However, the Court views the present facts as more than a mere disagreement as to an employer's assessment. Cherry contends that his allegedly poor performance was never discussed with him and is now being used as an excuse to justify discrimination against him. And while Premier Prints takes the opposite position, the company admittedly has no documentation whatsoever indicating the same, despite (as previously emphasized) allegedly having experienced employment issues with Cherry for several years. Thus, the Court only has before it competing testimony as to Cherry's work performance and the purported communications with him surrounding the same.

Cherry also points to Zeke's homophobic comments and negative opinion of homosexuals. As noted above, in his written discovery response and in his deposition, Cherry stated that Zeke made homophobic comments throughout Cherry's employment with the company. Examples of the alleged remarks are: "Should I turn queer or get a sex change?" [44], Ex. 5 at p. 4. Cherry also

---

[4] Billy's testimony on this point was synonymous, answering "no" when asked whether he had "ever seen any documentation, any e-mail, text message, document, anything that in any way criticizes David Cherry's work performance at Premier Prints." [38], Ex. 1 at p. 8. In addition, Meg Curtis testified that she did not document the conversation she allegedly had with Cherry regarding his work performance.

16

alleged that Zeke would hold fabric samples in front of his genitals and say, "Do you like the samples now?" [44], Ex. 1 at p. 18. Clint Wright testified that Zeke would make homophobic jokes, and he also confirmed that he had seen Zeke hold fabric in front of his genitals and make comments. *See* [38], Ex. 3 at p. 3. Zeke admitted to doing so on one occasion but denies any other wrongdoing in that regard.

As to the applicable standard for analyzing discriminatory comments, the Fifth Circuit has explained:

> In a circumstantial case . . ., in which the discriminatory remarks are just one ingredient in the overall evidentiary mix, we consider the remarks under a "more flexible" standard. To be relevant evidence considered as part of a broader circumstantial case, the comments must show: (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.

*Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475-76 (5th Cir. 2015) (quoting *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000)) (additional and internal citations omitted).

The Court finds that Zeke's comments (one of which is admitted) satisfy this standard. At least for summary judgment purposes, the comments show an animosity toward homosexual persons, and it cannot be seriously disputed that Zeke, as a part owner and president of the company, was primarily responsible for the challenged employment action or had influence over the decisionmaker. The Court certainly finds that the comments are worthy of *some* consideration at this stage.

In sum, the Court has before it competent summary judgment evidence that the owners of Premier Prints were unaware of Cherry's homosexuality until around September 2019 and that Cherry had kept his sexual orientation a secret for some period of time because he knew that Zeke

17

had a negative opinion of homosexuals based on statements he had made throughout Cherry's employment. Furthermore, there are competing statements as to whether Cherry's work performance was poor. But, despite Cherry's work performance allegedly having been deteriorating for several years and persons allegedly having discussed the same with him on multiple occasions, Premier Prints has come forward with no documentation whatsoever supporting its position on that issue. And Cherry, the highest-ranking non-equity employee of the company who had been with the company for over twenty years, was laid off in April 2020—just a few months after his sexual orientation became known.

Although Premier Prints certainly has evidence to support its position, such as the lunch with the owner of Chapter Three (when Cherry allegedly withheld certain information from Zeke) and taking his husband to the trade show, viewing the evidence as a whole and in the light most favorable to Cherry, a reasonable jury *could* find that Cherry's sexual orientation played a role in the adverse employment action. In other words, questions of fact remain, thereby rendering summary judgment inappropriate. *See*, *e.g.*, *Grogan v. Kumar*, 873 F.3d 273, 279 (5th Cir. 2017) ("It is not the court's role on summary judgment to weigh competing evidence or make credibility determinations.").

*Conclusion*

For the reasons set forth above, Premier Prints' Motion for Summary Judgment [38] is DENIED. Cherry will be permitted to proceed to trial on his Title VII discrimination claim.

SO ORDERED, this the 23rd day of August, 2022.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE